**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

SCOTT STURGEN,

                                        Plaintiff,                        8:22-cv-00049 (BKS/DJS)

v.

PAMELA BONDI, Attorney General,
U.S. Department of Justice,[1]

                                        Defendant.

**Appearances:**

*For Plaintiff:*
Kevin C. Crayon, II
Crayon Law Firm
125 Townpark Drive, Suite 300
Kennesaw, Georgia 30144

*For Defendant:*
John D. Hoggan, Jr.
Assistant United States Attorney
United States Attorney's Office
445 Broadway, Room 218
Albany, New York 12207

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Scott Sturgen brings this action against Defendant Pamela Bondi, Attorney

General for the United States Department of Justice, alleging that his former employer, Ray

Brook Federal Correctional Institution ("Ray Brook"), subjected him to a hostile work

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Pamela Bondi, the current United States Attorney General, has been substituted in place of her predecessor, Merrick Garland. The Clerk is respectfully directed to update the docket accordingly.

environment and gender discrimination, which led to his involuntary retirement. (*See generally* Dkt. No. 1). In the Complaint, Plaintiff asserts claims of involuntary retirement (constructive discharge), disparate treatment, and hostile work environment on the basis of sex, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., seeks review of a decision by the Merit Systems Protection Board ("MSPB" or "Board") dismissing Plaintiff's involuntary retirement claim, and asserts a claim of retaliation for whistleblower activity in violation of the Whistleblower Protection Enhancement Act ("WPA"), 5 U.S.C. § 2302(b)(8) and (9). (*Id.*). Presently before the Court is Defendant's renewed motion for summary judgment under Federal Rule of Civil Procedure 56. (Dkt. No. 38). Plaintiff opposes Defendant's motion. (Dkt. No. 39). Having considered the parties' submissions, including Defendant's reply, (Dkt. No. 40), the Court grants Defendant's motion for summary judgment.

## II.     BACKGROUND[2]

### A.     Ray Brook's Health Services Department and Chain of Command

Ray Brook, a United States Bureau of Prisons ("BOP") facility in Ray Brook, New York, is a medium security facility with approximately 730 male inmates. (R-0505). Plaintiff began his employment in Ray Brook's Health Services Department in 2010 as a registered nurse. (Dkt. No. 38-49, ¶ 2; Dkt. No. 39-1, ¶ 2). Approximately two years later, Plaintiff became the "Quality Improvement and Infection Control Nurse." (Dkt. No. 38-49, ¶ 3; Dkt. No. 39-1, ¶ 3). In this position, Plaintiff was "was expected to, among other things" "coordinate with Regional

---

[2] The facts are drawn from Defendant's Statement of Material Facts Not in Dispute, (Dkt. No. 38-49), Plaintiff's Response to Defendant's Statement of Material Facts, (Dkt. No. 39-1), and Plaintiff's Statement of Additional Material Facts, (Dkt. No. 39-2), to the extent the facts are well-supported by pinpoint citations to the record, the exhibits attached to and cited in the parties' submissions, and the certified administrative record. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Infectious Disease Control and teach staff about Infectious Disease Control, employ mitigation strategies for inspection spread," (Dkt. No. 38-49, ¶ 3; Dkt. No. 39-1, ¶ 3 (quotation marks omitted)), including, as relevant here, strategies to mitigate the spread of COVID-19 and tuberculosis ("TB"), and keep "abreast of rapidly changing protocol," (R-0179). Plaintiff avers that his "Quality Improvement" responsibilities included "monitoring and implementing isolation/quarantine, and reporting and correcting medication errors." (Dkt. No. 39-5, ¶ 6). Plaintiff testified that his duties also included reporting data to the Region, to Essex County Public Health, and to State Public Health.[3] (R-0192).

During the relevant time period, Plaintiff's first-line supervisor was Acting Health Services Administrator Scott Gladden.[4] As the acting HSA, Gladden was also the first-line supervisor for the other medical staff in the department, including nurse practitioner Kimberly Sorrell, the health technicians, and the nurses. (R-0675). Plaintiff's second-line supervisor was Assistant Warden Kimberly Straesser ("AW Straesser"), who oversaw the Health Services Department and directly supervised Acting HSA Gladden. (R-0506, R-0613).

---

[3] Plaintiff's "Position Description" states, in relevant part:

> The Incumbent's primary duties are surveillance of infections and diseases, management of the tuberculosis prevention and control program, contact investigations and containment of infectious disease outbreaks, infection prevention activities including immunization administration and tracking for inmates and staff, education related to infection control practices, collection and analysis of data to reduce risk and improve health outcomes, and notification to the national Infection Prevention and Control Officer and public health authorities at all levels of government about reportable infectious conditions.

(R-0294).

[4] Gladden was Ray Brook's Supervisor of Education but was "serving at [sic] the acting HSA until a permanent HSA was hired." (R-0503; Dkt. No. 38-49, ¶ 24; Dkt. No. 39-1, ¶ 24). There is no evidence regarding Gladden's health services background, if any.

### B.     Retirement Inquiries

On or about May 12, 2020, Plaintiff sent an email to the BOP's Consolidated Benefits Center in Grand Prairie, Texas indicating that he was "looking at tentatively retiring on or around" August 1, 2020, his retirement eligibility date, and requesting assignment of "a retirement counselor" to assist with "further arrangements." (R-0670). On May 18, 2020, Plaintiff sent the Benefits Center a second email, copied to Ray Brook Human Resource Manager, Valerie LaPoint, noting that his request for the assignment of a retirement counselor "remains unanswered." (R-0669).[5]

### C.     COVID-19 Test Machine (May/June 2020)

According to Plaintiff, in May or June 2020, the Region sent him an "Abbott [medical] test machine" so that he "could train the staff how to use it," but that Ray Brook Warden Stanley Lovett "confiscated" the machine "and put it in his office." (R-00185–87). Warden Lovett stated that "Ray Brook was provided the Abbott machine in order to Covid test inmates," and "since the institution had not established the appropriate area to perform the tests safely and in accordance with Bureau guidance, the Abbott machine was placed" in his "conference room for accountability purpose." (R-0342). Gladden recalled the machine being "placed up in the Warden's Office area, just for safekeeping."[6] (R-0505).

---

[5] LaPoint described the BOP retirement process as follows:

> Staff are required to send their requests for retirement directly to our Grand Prairie, Texas office. Once he sends the request, he is then assigned a Benefits Specialist. The Benefits Specialist works directly with the staff member to complete any and all paperwork needed to complete the process. Once completed, the Benefits Specialist will then send notification to the local HR office via email when a retirement has been submitted.

(R-0554).

[6] Gladden further stated that the Warden's office area was "the Command Center for a lot of the COVID . . . tracking equipment, as well as gloves, masks, hand sanitizer, and personal protection equipment ("PPE"). (R-0515).

Plaintiff stated that he and Gladden met to discuss the test machine and that Gladden told him that "the Warden wanted it confiscated and placed in the Warden's conference area." (R-0186). Plaintiff testified that he told Gladden: "That's totally inappropriate. That's a medical test machine. It needs to be in a lab and I need to develop a competency program. I need to train myself on the machine and then I need to train staff." (*Id.*). Plaintiff stated that Gladden then told him that the "Warden does not like [Plaintiff's] demeanor and that they took the machine and they placed it up in the Warden's office." (*Id.*).

Plaintiff asserts that he contacted Gerard Travers, the Regional Health Systems Administrator for the BOP's Northeast Region, and asked: "What's the protocol? How am I going to train my staff if I don't have" the Abbott test machine? (R-0186). Plaintiff states that Travers responded that "he didn't know" and "he didn't understand why it was taken." (*Id.*). Plaintiff explained to Travers that he was concerned that if he could not "identify or test the inmates" or "train staff," and if he lacked "the tools to control pathogen spread," that there would be "sickness and death" and "they" would "want to hold somebody responsible," and he did not want to be that person. (*Id.*). Travers recalled receiving correspondence from Plaintiff indicating that the test "machine had arrived and was kept in the command center along with the supplies" and stated that he told Plaintiff that "the machine should be returned to the lab." (Dkt. No. 38-10, at 2, 5).

Gladden states that "after talking with the Warden and the medical staff, we thought it would be better" if the Abbott test machine was "brought down to the medical area where we could be trained on the machine, which ultimately happened." (R-0515). Gladden states that the machine was in the Warden's office for "a matter of maybe days, maybe a week or two." (R-0516).

### D.    Incentive Request (July 2020)

On or about July 9, 2020, Plaintiff sent an email to Michael Magyar, Assistant Health Systems Administrator at Allenwood, another BOP facility, following up on a "incentive request" Magyar sent in June on Plaintiff's behalf to Gladden, AW Straesser, and Travers. (R-0659). Plaintiff wrote that "HR denies any knowledge of this action" and that when he asked Gladden "about it . . . he indicated that if we someday get an assigned HSA, maybe they will advocate for this." (*Id.*). Plaintiff further wrote that he had "only 6 working days" until he was eligible for retirement and that he had indicated that he would stay if there "was an incentive offered." (*Id.*). Plaintiff asked whether "any medical staff [were] getting this for good working history and working during COVID?" (*Id.*). On July 10, 2020, Magyar replied that he had forwarded the incentive requests to AW Straesser along with his "other recommendations," and that she "acknowledged stating she would follow up with Gladden and HR," and that "[m]ost nursing across the agency is receiving this incentive to remain competitive within the community." (*Id.*). Plaintiff thanked Maygar for his help and stated that he would be "burning time for next two weeks." (*Id.*). Plaintiff states that he was "turned down" for incentive pay but that Sorrell received incentive pay. (R-0183).

### E.    Positive TB Test (July/August 2020)

In late July 2020, Plaintiff, who was tasked with testing new staff members for TB, contacted Human Resources to arrange to test a new staff member and indicated he wanted to "plant a PPD"[7] on a Tuesday because the test has to be read "48 to 72 hours later," but HR "wanted [Plaintiff] to do it on a Thursday." (R-0187). Plaintiff replied that he would not be there on Thursday and if the PPD were planted on Thursday, it would have to be read on Saturday,

---

[7] "The PPD skin test is a method used to diagnose silent (latent) [TB] infection. PPD stands for purified protein derivative." https://medlineplus.gov/ency/article/003839.htm (last visited Sep. 5, 2025).

when the medical staff were not there. (*Id.*). Plaintiff states that he was "overridden by Human Resource [Valerie] LaPointe," that the issue was "forwarded" to his supervisor, Gladden, who told Plaintiff he "was inappropriate," and that Plaintiff received an email from Warden Stanley Lovett's executive assistant stating the "PPD will be planted on Thursday as scheduled." (*Id.*).

When Plaintiff checked the staff member the following week, "[p]ast [the] 48–72 hour time frame," the test appeared to be "positive for PPD." (R-0478; R-0187). The PPD was "replanted" and again appeared to be positive. (R-0478). Plaintiff sent an email to Jason Kopera, the Northeast Regional Quality Improvement/Infection Prevention and Control Coordinator, (R-0260), asking whether the employee should be permitted to report for work, noting that the "Tuberculosis Control Plan" did not provide a "clear guideline." (R-0478). Kopera replied that it was up to the "Clinical Director" and that Plaintiff may "want to refer this question to Silvie Cohen, Chief of Occupational Health." (*Id.*). Plaintiff contacted Cohen and Travers via email and gave them "the situation." (R-0187). Plaintiff also emailed the Acting Clinical Director and asked her "to review this and get back to me," and she responded that Plaintiff could not "clear him without a chest x-ray." (R-0188; R-0482). Plaintiff then sent an email to Human Resources advising that the applicable policy "says that the staff member needs to go and get a chest x-ray and get cleared by his primary care physician on the street." (R-0187). Plaintiff attached the "Tuberculosis Control Plan and BOP guidelines" to the email. (*Id.*). According to Plaintiff, that email "resulted in a meeting with Gladden," which he "guess[ed] was a disciplinary meeting." (*Id.*; *see also* R-0188 (describing meeting as "another counseling by Gladden")). Plaintiff states that Gladden told him "they were mad" because Plaintiff had included an excerpt from the "Tuberculosis Control Plan" in the email. (R-0187). Plaintiff explained that he had included the excerpt as "a courtesy" so that no one would have to "look it up." (*Id.*). However, Gladden

described the "issue" as one of notification, acknowledging that Plaintiff "should . . . report cases up to the Regional Office because that's his counterpart," but that he should make sure that the "situation" was "relayed" to Gladden "as well" so that Gladden "could notify the Executive Staff of the situation." (R-0516).

### F.    Brooklyn Inmates Positive COVID-19 Tests (August 2020)

On or about August 14, 2020, Ray Brook "had some inmates come in from Brooklyn." (R-0185; R-0188). After the inmates tested positive for COVID-19, (R-0185), Plaintiff emailed Regional HSA Travers: "Touchy question best answered via telephone concerning contact tracing . . . . Just trying to determine what to do for . . . staff . . . who saw [inmates] on intake with interview conducted in very small room. Should we contact them with data concerning inmates in question and exposure risk[?]" (R-0112). In reply, Travers attached a "form letter" he had used for staff notification and advised Plaintiff to "call the staff as well as send the letter via email" and to "CC safety and HR." (*Id.*).

When Plaintiff sent this information in an email to Human Resources, he received an email response from Gladden saying "that we need to speak." (*Id.*). Plaintiff states that he told Gladden that the staff exposed to the Brooklyn inmates "should be notified" but that Gladden told Plaintiff that he "could not reach out to the other Departments" and staff was not notified. (*Id.*; R-0193). Later that week, Plaintiff met Warden Lovett in the Lobby "while he was walking around" and "told him that [he] had tested these inmates." (R-0193). Warden Lovett responded that "the test was probably a false positive." (*Id.*). Plaintiff replied that although there was a chance of "false negatives," "false positives [were] very, very unlikely because it tests RNA." (*Id.*). Plaintiff asserts that the Warden then accused him of "falsif[ying] the test results for [his] own agenda," and no staff were notified. (*Id.*). According to Plaintiff, when the "COVID Review Team" later looked into Ray Brook's handling of the positive inmate tests, there "was a hit" and

8

the COVID Review Team found Ray Brook had "failed" and Plaintiff was "made . . . responsible for a failure that was not [his] failure." (R-0185).

Gladden testified that he could not recall the protocol for COVID-19 exposure notification at the time the Brooklyn inmates tested positive, but that he believed that as Infectious Disease Control Specialist, it was Plaintiff's job—not Human Resources's—to "identify who came into contact with who and to try to mitigate the spread of anything." (R-0518–19).

### G. Retirement Emails and Submissions (September/October 2020)

On September 24, 2020, LaPoint received "an email from the Benefits Specialist [Beth Hill] . . . which stated [that Plaintiff] has applied for retirement effective 10/23/2020. (R-0553; *see also* R-0666). In her email to LaPoint, Hill further stated that Plaintiff was "inquiring about staying on longer" and only had "10 years in the Bureau," and asked whether "he was brought in on a waiver" and whether he could "stay until he has 20 years in to received [sic] a full annuity?" (R-0666). LaPoint replied that Plaintiff "was not brought in on a waiver as he was initially hired as a registered nurse and there is no requirement for a waiver for his position." (*Id.*). On or about September 27, 2020, Plaintiff submitted his resignation paperwork to Beth Hill. (R-0186).

On or about October 5, 2020, Plaintiff received an email from the BOP Consolidated Benefits Center attaching the "retirement forms that need to be completed and mailed back," asking that Plaintiff "not change [his] retirement date" "after this point in the process" and advising that if, "for any reason" there was "a possibility" that Plaintiff "might change [his] retirement date after this point," to please let the Consolidated Benefits Center know "as soon as possible." (Dkt. No. 38-48, at 2–3).

### H.    Quarantine Recommendations and Counseling Meeting

In an October 6, 2020 email to "RBK/Human Resources" and Gladden, Plaintiff advised that an inmate had tested positive for COVID-19 the previous day and been placed in isolation, and that he was contacting HR "for the purpose of notifying possible staff exposure." (Dkt. No. 38-25, at 4). Plaintiff stated that in order "to make sure that [he] was doing the right thing" for the facility in response to the positive COVID-19 test, he had "reached out to the Region[al] Infectious Disease Control Coordinator," Jason Kopera, for advice. (R-0183). In an October 7, 2020 email to NP Sorrell, Gladden, and Loretta Wood (Warden Lovett's executive assistant), Plaintiff further advised that the "[r]ecommendation" was to secure the inmate's "housing unit in quarantine status immediately," start "temp and symptom check on inmates" in that housing unit, and utilize testing. (Dkt. No. 38-25, at 2).

That same day, Plaintiff and Gladden had what Plaintiff referred to as a "counseling meeting" and which lasted "over two hours." (R-0183). According to Plaintiff, Gladden informed him that the Warden was "mad at" Plaintiff about his "e-mail recommendation to isolate the known [COVID-19] positive inmate." (*Id.*). Plaintiff further states that during the meeting, Gladden noted that Plaintiff had "failed on the COVID Review Team item." (R-0185). Plaintiff denied this, told Gladden that he had "done [his] job," and reminded Gladden that he had "reached out to the other Department because that was the protocol; for [Plaintiff] to identify the positive case; for [Plaintiff] to tell HR and for HR to notify the staff members." (*Id.*).

According to Plaintiff, during the "second hour of that counseling," NP Sorrell came in "because she heard the raised voices" and told Gladden that Plaintiff's "recommendation was totally appropriate." (R-0188). During that meeting, Plaintiff contacted Malcolm, an experienced Health Services Administrator at FCI Berlin, "so he could explain to Mr. Gladden what my job

was," and Malcolm told Gladden that "what [Plaintiff] was doing was [his] job," and that "everything [Plaintiff] was doing was appropriate to [his] job." (R-0189).

Plaintiff also stated that he received two phone calls during that meeting. First, Captain James Buckle called Plaintiff "screaming" and told Plaintiff that the Warden wanted Plaintiff "on the housing unit to temp all the inmates." (R-0183). Ten minutes later, Plaintiff received a call from Lieutenant Ryan St. Louis, who told Plaintiff that the Warden "wants your ass up on the hill taking temps." (*Id.*). St. Louis testified that his supervisor, Captain Buckle, directed him to "get people that were certified in temperature taking" to start taking temperatures in the housing unit at issue. (R-0497). St. Louis further stated that "[o]ut of a courtesy," he let Plaintiff know, that "the Warden and the Captain had given [him] a directive" and "they want [Plaintiff] up here to do this, you need to get up here," but that Plaintiff said that he "wasn't coming up because he was in a meeting." (R-0497–98). According to St. Louis, ultimately, he "and several HR staff" took the temperatures. (R-0497).

Gladden also recalled the October 7, 2020, meeting but testified that it "related to communication" and "[h]ow certain things were communicated to the Executive staff." (R-0520). Gladden stated that he subsequently emailed Plaintiff an apology because Plaintiff had been "correct" in his assessment of the situation involving an inmate who had tested positive for COVID and the requirement that the "whole housing unit" had to be quarantined. (R-0521; Dkt. No. 38-27, at 2 (email from Gladden apologizing to Plaintiff "for not handling the situation regarding the email . . . better")). Gladden testified that Ray Brook "ended up quarantining" the exposed unit after receiving "guidance from the Region and from Central Office" directing that the "whole unit" be quarantined and tested. (R-0521). Gladden agreed that "this was a situation

where" Plaintiff had notified the Region but had not "notified his local chain of command." (R-0521).

## I.    Schedule Changes

Plaintiff claims that his "schedule was changed all the time" and that he "was working weekends, afternoons, [and] they were using [Plaintiff] as vacation relief" and "training relief." (R-0185). Plaintiff states that the scheduling changes happened to him, "much more so than Sorrell." (*Id.*). Plaintiff was "sleeping in the parking lot to cover all the shifts." (R-0191). Plaintiff asserted that he "felt [his] life was in jeopardy because [he] was getting more and more exposure to COVID cases" because he was doing "bedside care" and "they wouldn't get us staff." (R-0191).

Gladden testified that from April to October 2020, "they were short staffed" and he would ask Plaintiff "to cover overtime positions," and that Plaintiff would respond that he was willing to do that. (R-0524). Gladden stated that Plaintiff "was always very willing to help out to make sure that the job got done" and that when he would relay to Plaintiff that "tests needed to be done or temperatures needed to be ran, and due to staffing shortages, he stayed and he covered those." (*Id.*). Gladden denied changing Plaintiff's schedule arbitrarily" and stated that "any change that was made was within the scope of our duties and his responsibilities as well." (*Id.*).

## J.    Coverage for Absent HSA

Plaintiff asserts that it "is standard operating procedure to have people in plaintiff's job position act Assistant Health Service Administrator or to be assigned as Acting HSA when HSA is out of facility." (Dkt. No. 39-22, at 15). According to Plaintiff, Acting HSA Gladden "assigned Carrie Denton, Dental Technologist, as Acting HSA" in his absence, even though Denton had "no medical degree" and had not "worked a custody post or housing unit." (*Id*. at

16). Plaintiff states that when Gladden took these actions, Gladden issued a facility wide email to all staff, which, according to Plaintiff "sent a strong message to staff and inmates in the compound." (*Id.*; *see also* Dkt. No. 39-27, at 23 (Plaintiff explaining he was "punked out in the compound" when Gladden assigned Denton, who had "no credentials or less credentials" than he did, as Acting HSA and sent email to all staff).

### K.    New Health Services Administrator

On October 13, 2020, Bradford Malcolm began work as the HSA at Ray Brook. (R-0571). Malcolm testified that he "was talking with" Plaintiff "a good month or two" before moving from FCI Berlin to Ray Brook and he was aware that Plaintiff was "very frustrated . . . about not being able to implement policy . . . and feeling that he was being shut down." (R-0582). Malcolm stated that he would advise Plaintiff to make his "notifications . . as policy states and move on" and not "take anything like that personally." (*Id.*). Malcolm testified that before he started working at Ray Brook, when Plaintiff brought up retirement, Malcolm responded that when he got there, they "can make some departmental changes" and "administrative changes" and that there were "things" he could "look at behind the scenes and . . . within our department that I can help you with." (*Id.*). Malcolm stated that Plaintiff responded that he was "done" and apologized that he was "not going to be around" but that he had "made [his] decision." (R-0583). Malcolm stated that when he arrived at Ray Brook, he "had a one-on-one with" Plaintiff and asked: "is there anything I can do . . . ? I mean, I'm here now. Let's move forward . . . what can I do to help you move forward?" (R-0582–83). According to Malcolm, Plaintiff responded: It's already too late for that. . . . I'm spent—I'm worn out. I . . . can't do this anymore" And that he "kept getting knocked down," that there was "resistance" to "everything he was trying to implement," and was "tired of being . . . reprimanded." (R-0583). Plaintiff testified that he had

no recollection of Malcolm offering to make changes or working behind the scenes to help Plaintiff. (Dkt. No. 39-27, at 60).

**L.    Plaintiff's Final Performance Evaluation and Retirement**

In his last performance evaluation from Gladden, Plaintiff received "three Outstanding's and two Excellent's" and "by virtue" of that evaluation, Plaintiff could have requested a "performance increase." (R-0190).

Plaintiff testified that he resigned because "fall was coming," there would be "much more sickness and COVID patients," and his job was "to coordinate with the Region," "coordinate administering vaccines," and report "COVID data," (R-0189), but that he "was being disciplined for everything [he] was doing," and that led him to believe his "job was in jeopardy," (R-0191). Plaintiff stated that he also felt his "life was in jeopardy because [he] was getting more . . . exposure to COVID cases" doing bedside care and had been "sleeping in the parking lot to cover all the shifts." (*Id.*). Plaintiff testified that Gladden, and "people on the compound," told him "that the administration was after [Plaintiff] for ratting to the Region," and that "the administration and the Warden was [sic] furious" with Plaintiff. (*Id.*). Plaintiff stated that no one had presented proposals of disciplinary or performance-based action at the time he decided to resign, but Plaintiff felt it "was imminent" and testified that it was "spoken" and "common knowledge in the facility." (*Id.*). Both NP Sorrell and Nurse Michael Peck told Plaintiff "[t]hat if they were in [Plaintiff's] shoes, they would leave." (R-0191).

Plaintiff submitted his retirement paperwork on or about October 19, 2020. (Dkt. No. 38-44, ¶ 9). Plaintiff's "retirement date" was October 23, 2020. (*Id.* ¶ 11). Ray Brook Human Resource Manager Thomas Shova stated in a declaration that "[a]t any time leading up to his retirement date of October 23, 2020, Plaintiff could have rescinded his request to retire and continued his employment at FCI Ray Brook." (*Id.*). Plaintiff disputes this and testified that Beth

14

Hill in the Benefits Services office told him that once he submitted his retirement paperwork, he "couldn't reverse it." (Dkt. No. 39-27, at 33).

### M.      Additional Alleged Discriminatory or Retaliatory Conduct

Plaintiff stated in his declaration that in or around "the Spring of 2020, AW Straesser directly ordered [him] to not update Essex County Public Health about mandated reportable infectious diseases." (Dkt. No. 38-5, ¶ 30), AW Straesser indicated in her response to interrogatories that while she recalled that Plaintiff "reported information to the regional office" she did "not recall a need for him to contact County or State health directly, as health services staff were only responsible for inmates [sic] health care." (R-0217). Malcolm, who became the HSA at Ray Brook around the time of Plaintiff's retirement, testified that notification of contacts in Essex County fell within Plaintiff's "job title." (R-0243–44).

Plaintiff and Ray Brook's Clinical Director "attempted to inspect and plan to open empty housing units for isolation and quarantine purposes and were prohibited to do so by AW Straesser." (Dkt. No. 38-5, ¶ 31). Warden Lovett never advised Plaintiff "which staff members were COVID-19 positive." (*Id.* ¶ 32).

According to Plaintiff, Warden Lovett would "deal with [NP] Sorrell . . . on Infectious Disease Control," even though her job was patient care, and infectious disease control was Plaintiff's job. (R-0190). Plaintiff asserts, for example, that he "was excluded from quarterly meetings and Infectious Disease Control meetings" at Ray Brook, while NP Sorrell, whose primary duties were "patient care," was included in those meetings with the Warden Lovett. (Dkt. No. 39-5, ¶¶ 14–15). In addition, Plaintiff asserts that BOP policy indicated that he was "supposed to meet . . . quarterly . . . with the Warden" but that his requests for meetings were

denied. (R-0190).[8] NP Sorrell testified that she was aware that Plaintiff met "resistance to any of his suggestions for managing the pandemic" and was being told he was not being allowed to "reach out to his counterparts at the Region," but that it was his job to do so. (R-0326–27). NP Sorrell also testified that she saw Plaintiff's frustration and concern that he would be held responsible if something went wrong "with the COVID issue at the institution" and acknowledged that "[t]hings that came from [her] were much more accepted and I could've said it exactly as he did and it wouldn't have been met with the same resistance that he got." (R-0330).

Plaintiff testified that he told Gladden that he was being discriminated against because he was speaking "out about this stuff" and because he was "not female." (R-0189). Plaintiff did not provide a date or context.

## III.    PROCEDURAL HISTORY

On or about December 11, 2020, Plaintiff filed a "Whistleblower Complaint" with the Office of Special Counsel's ("OSC") Disclosure Unit. (R-0006; R-0024 (OSC noting that Plaintiff "referred" information "to the Disclosure Unit"); *see also* R-0090 to R-0099 (document labeled "Sturgen OSC Whistleblower Complaint" but lacking formal heading or address)). In a letter dated January 21, 2021, an OSC attorney informed Plaintiff the "Disclosure Unit" had "completed its review of the information [Plaintiff] referred" alleging "a violation of law, rule, or regulation and a substantial specific danger to public health and safety by officials at the Department of Justice (DOJ), Bureau of Prisons (BOP)," and FCI Ray Brook. (R-0024). "Based on the information provided, [OSC could not] conclude that there is a substantial likelihood that

---

[8] NP Sorrell testified that she believed the quarterly meetings were required by BOP but that, as far as she was aware, they "never had them." (R-0333).

BOP officers acted outside their discretion." (R-0025). OSC advised Plaintiff that "[s]hould [he] wish to pursue this matter further," he could contact the Inspector General at the Department of Justice and that it was closing the file. (*Id.*).

On or about February 2, 2021, Plaintiff filed a "Complaint of Discrimination" with the United States Department of Justice's Equal Opportunity Office ("EEO"). (Dkt. No. 38-29, at 2 (noting date Plaintiff's first contact with EEO as December 3, 2020)); *see also* 29 C.F.R. § 1614.105. On September 30, 2021, the EEO issued a "Final Agency Decision" concluding that the record did not support a claim of disparate treatment, hostile work environment, or a constructive discharge on the basis of sex or prior EEO activity." (R-0009–23).

On October 13, 2021, Plaintiff filed an "Appeal of Agency Personnel Action or Decision" regarding his "Involuntary Retirement" with the Merit Systems Protection Board ("MSPB" or "Board"). (R-0003–08). In an "Initial Decision" dated November 19, 2021, MSPB Administrative Judge ("AJ") Nicole DeCrescenzo found that although it was "clear that the [Plaintiff's] work conditions in 2020 were suboptimal," Plaintiff had "failed to nonfrivolously allege that his retirement was involuntary" and therefore dismissed Plaintiff's appeal "for lack of jurisdiction" and without reaching the merits of Plaintiff's discrimination claims. (R-0762–69; *see also* R-0766 (explaining that once the MSPB's jurisdiction has been established through "nonfrivolous" allegations of involuntary removal, "issues of discrimination may then be adjudicated under the standards applicable for proof of discrimination under Title VII as a mixed case")).[9] This decision "became final on December 24, 2021." (R-0769). On January 20, 2022, Plaintiff filed the instant action. (Dkt. No. 1).

---

[9] *See Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1325 (Fed Cir. 2006) (en banc) (explaining that to establish the MSPB's jurisdiction over an involuntary retirement claim, an employee must make a "non-frivolous allegation" that his retirement or resignation was involuntary); *Shoaf v. Dep't of Agr.*, 260 F.3d 1336, 1340–41 (Fed. Cir. 2001)

## IV.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable

---

(explaining that "[a] decision to resign or retire is presumed to be voluntary," and "[a]n employee who voluntarily resigns or retires has no right to appeal to the MSPB").

to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## V.    DISCUSSION

### A.    Title VII

Defendant moves for summary judgment dismissing Plaintiff's Title VII claims on the grounds that he fails to identify any facts showing sex-based discrimination and fails to adduce evidence of a hostile work environment, involuntary retirement, or disparate treatment. (Dkt. No. 38-1, at 13–23). Plaintiff opposes Defendant's motion. (Dkt. No. 39-3, at 21–24). A plaintiff seeking judicial review following a final decision by the MSPB, is entitled to de novo review of his or her federal discrimination claim. *Downey v. Runyon*, 160 F.3d 139, 145 (2d Cir. 1998).

#### 1.    Hostile Work Environment

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate harassment on the basis of his or her sex, 42 U.S.C. § 2000e-2(a), and "that his or her workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered.'" *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708

F.3d 102, 105 (2d Cir. 2013)). Additionally, the plaintiff must show "a specific basis for imputing the hostile work environment to the employer." *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).

The hostile work environment standard "includes both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)). Courts may also consider "whether [the conduct] is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). To survive summary judgment on a hostile work environment claim, "[t]he incidents typically 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Agosto*, 982 F.3d at 102 (quoting *Alfano*, 294 F.3d at 374).

Title VII does not impose "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation and internal quotation marks omitted). "Conduct that is merely offensive, unprofessional, or childish cannot support a hostile work environment claim." *Payton*

*v. City Univ. of N.Y.*, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) (internal quotation marks

omitted); *accord Zucco v. Auto Zone, Inc*., 800 F. Supp. 2d 473, 476 (W.D.N.Y. 2011) (noting

that "sporadic, isolated incidents of boorish or offensive use of language are insufficient to

establish a hostile work environment" (internal quotation marks omitted)). Further, "[i]ncidents

that are few in number and that occur over a short period of time may fail to demonstrate a

hostile work environment." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d

Cir. 2000) (internal quotation marks omitted).

  "The question of whether a work environment is sufficiently hostile to violate Title VII is

one of fact." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001). But if no reasonable

jury could conclude, considering all the circumstances, that "the harassment is of such quality or

quantity that a reasonable employee would find the conditions of her employment *altered for the*

*worse*," *Schiano*, 445 F.3d at 600 (quoting *Whidbee*, 223 F.3d at 70 ), a court may conclude as a

matter of law that the work environment is not sufficiently hostile to violate Title VII.

  Construing the record in the light most favorable to Plaintiff, Plaintiff has described a

series of incidents and interactions undermining and interfering with his position as the

Infectious Disease Control Nurse at a correctional facility during the COVID-19 pandemic,

punishing him for communicating with and reporting to regional, state, and local authorities as

required by his position, endangering his health, and precluding him from meetings with the

Warden. Specifically, Plaintiff has adduced evidence that: (1) in May or June 2020, Warden

Lovett "confiscated" the COVID-19 test machine that the Region had sent to him with the

intention that he train staff to use it for testing, (R-00185–87); (2) in July 2020 the executive staff

denied a request, sent on Plaintiff's behalf, for incentive pay, while NP Sorrell received incentive

pay, (R-0183, R-0659); (3)(a) in late July/early August 2020, Valerie LaPoint (Human

Resources) and Loretta Woods (Warden Lovett's executive assistant) interfered with his duty to test a new staff member for TB, leading to a reprimand by acting HSA Gladden for his "inappropriate conduct" in interacting with LaPoint and Woods, (R-0187–88); (b) in August 2020, Gladden subjected Plaintiff to a counseling session after the staff member tested positive for TB on the grounds that Plaintiff had improperly contacted his regional counterparts for advice and had included an excerpt from the BOP's TB "Control Plan" when he emailed Ray Brook staff, (R-0187–88; R-0516); (4)(a) in mid-August 2020, Gladden refused to notify staff exposed during intake after inmates arriving from Brooklyn tested positive for COVID-19 and instructed Plaintiff not to reach out to "other Departments," (R-0185; R-0193); (b) Warden Lovett told Plaintiff the tests on the Brooklyn inmates were likely "false positive[s]" and accused Plaintiff of "falsif[ying] the test results for [his] own agenda," (R-0193); (5)(a) in early October 2020, Gladden subjected Plaintiff to a two-hour counseling session because Warden Lovett was "mad" that Plaintiff had recommended that an inmate who tested positive for COVID-19 be isolated and made recommendations about contact tracing and quarantine, (R-0183, R-0185, R-0188); (b) during the October 2020 counseling session, two officers, at Warden Lovette's direction, called Plaintiff and demanded that he get his "ass up on the hill taking temps," (R-0189); (6) Plaintiff's "schedule was changed all the time" and he had to sleep in the parking lot to cover his shifts, (R-0191); (7) AW Straesser ordered Plaintiff not to make county notifications regarding infectious disease, which was contrary to his job responsibilities, (Dkt. No. 38-5, ¶ 30; R-0243–44); (8) AW Straesser prohibited Plaintiff from opening empty housing for isolation and quarantine, (Dkt. No. 38-5, ¶ 31); (9) the Warden would meet with NP Sorrel regarding infectious disease, excluded Plaintiff from meetings, and denied Plaintiff's request to meet, (R-

22

0190); and (10) Gladden assigned a dental technologist to serve as Acting HSA in his absence and notified all staff via email, (Dkt. No. 39-27, at 22–23).

The above incidents do not, on their own, reflect any sex-based or sex-related conduct. *See*, *e.g.*, *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 120–21 (S.D.N.Y. 2022) (finding the actions the plaintiff identified as part of her hostile work environment claim, including evidence that the plaintiff was micromanaged and "written up for matters that comparable White supervisors were not reprimanded for," "left out of important supervisory matters and denied sufficient staff support," "undermined in her daily responsibilities," and "denied additional compensation for an increased workload" to be "neutral as to" the plaintiff's race and ethnicity). And although Plaintiff strongly believes the Warden Lovett "had a proclivity to listen to the ladies," including NP Sorrell, LaPoint from Human Resources, and Woods, his executive assistant, but would not even meet with him, (R-0181), it is well established that [a] plaintiff's 'feelings and perceptions of being discriminated against are not evidence of discrimination.' " *Petrisch v. HSBC Bank USA, Inc.*, No. 07-cv-3303, 2013 WL 1316712, at *13, 2013 U.S. Dist. LEXIS 45346, at *41 (E.D.N.Y. Mar. 28, 2013) (quoting *Lee v. Sony BMG Music Entm't, Inc.*, No. 07–cv–6733, 2010 WL 743948, at *9, 2010 U.S. Dist. LEXIS 19481, at *24 (S.D.N.Y. Mar. 3, 2010)). However, "[f]acially neutral incidents may be included . . . among the 'totality of circumstances' that courts consider in any hostile work environment claim," provided that plaintiff offers "some circumstantial or other basis for inferring that incidents . . . neutral on their face were in fact discriminatory." *Alfano,* 294 F.3d at 378

Plaintiff asserts when those incidents are viewed in light of the evidence that NP Sorrell could make statements to the Region without recrimination, that Plaintiff often performed NP Sorrell's patient-care duties, that NP Sorrell was permitted to attend meetings with Warden

Lovett concerning infectious disease control, while he was excluded, that NP Sorrell's schedule did not change, and that NP Sorrell received incentive pay, a reasonable factfinder could conclude that the Warden, AW Straesser, and Acting HSA Gladden (the executive staff) exhibited animosity toward him that they did not show to NP Sorrell, and that the different treatment was based on sex.[10] (Dkt. No. 39-3, at 22). But the evidence Plaintiff relies on this regard is wholly insufficient to create a material issue of fact. For example, although NP acknowledged that "[t]hings that came from [her] were much more accepted and I could've said it exactly as he did and it wouldn't have been met with the same resistance that he got," (R-0330), this testimony is speculative. There is no evidence showing when or if NP Sorrell communicated with county, state, or regional officials. Further, although there appears to be agreement that NP Sorrell attended meetings with Warden Lovett, Plaintiff fails to identify evidence regarding when those meetings took place, who attended, or the specific matters they concerned. Plaintiff's assertion that NP Sorrell received "incentive pay" is likewise devoid of factual detail, and thus there is no basis on which to draw any comparison. Nor is there any evidence from which a factfinder could infer that the assignment of patient care duties to Plaintiff as an infection control nurse allows an inference of different treatment based on sex. Without more, the fact that NP Sorrell was also responsible for patient care does not support such an inference. Finally, to the extent Plaintiff relies on HSA Malcolm's acknowledgement that "Plaintiff was treated differently without explanation," (Dkt. No. 39-3, at 22 (citing R-

---

[10] To prevail on a comparator argument, a plaintiff must support his argument with specific, non-conclusory evidence that "the individuals with whom plaintiff compares himself '[are] similarly situated in all material respects,'" including that they were "subject to the same performance evaluation and discipline standards [and] that similarly situated employees who went undisciplined engaged in comparable conduct." *Hogan v. State of Conn. Judicial Branch*, 220 F. Supp. 2d 111, 119 (D. Conn. 2002) (first quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997); and then quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). Although Defendant argues that Plaintiff failed to show that he and NP Sorrell were similarly situated, the Court need not resolve this argument because even assuming NP Sorrell is a suitable comparator, Plaintiff's claim fails.

0184)), in support of his hostile work environment claim, it is unavailing for the same reason as the rest of the proffered evidence, it is entirely neutral and thus does not permit an inference of gender discrimination. Thus, on this record, no reasonable jury could find that the environment Plaintiff experienced while at Ray Brook was on account of his gender. *See, e.g., Staten v. City of New York*, No. 14-cv-4307, 2015 WL 4461688, at *14, 2015 U.S. Dist. LEXIS 94634, at *36 (S.D.N.Y. July 20, 2015) (dismissing hostile work environment claim where, "aside from his own speculation, Plaintiff offers nothing to suggest that any of [the alleged hostile behavior was] based on some discriminatory motive" and collecting case law reaching similar conclusions); *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y. 2009) ("Plaintiff's speculation about his supervisors' motives cannot substitute for evidence of conduct manifesting [discriminatory] animus on the part of Hertz's employees"); *cf. Little v. New York*, 96-cv-5132, 1998 WL 306545 at *6, 1998 U.S. Dist. LEXIS 21797, at *16 (E.D.N.Y. June 8, 1998) ("It is well settled that a plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn.").

Accordingly, the Court grants Defendant's motion for summary judgment on his hostile work environment claim under Title VII.

### 2.    Constructive Discharge

Discrimination claims under Title VII are analyzed under the three-part *McDonnell Douglas*[11] burden-shifting framework. *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) ("The Title VII . . . discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green.*"). Under this burden-shifting framework, Plaintiff must first establish a prima facie case of discrimination by

---

[11] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

showing that: (1) he is a member of a protected class; (2) he was qualified for the position at issue; (3) he was denied the position; and (4) the circumstances of that decision give rise to an inference of unlawful discrimination. *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). Plaintiff's burden of proof is *de minimis* at this stage. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). If the plaintiff succeeds in showing a prima facie case of discrimination, a presumption of discrimination arises, and the burden shifts to the defendant to demonstrate some legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Ruiz*, 609 F.3d at 492. If the defendant provides such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42; *see also Kwan v. Andalex Grp., LLC,* 737 F.3d 834, 845 (2d Cir. 2013). Defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

To prove a discrimination claim under Title VII, "[s]o-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

Only the third and fourth elements of the prima facie case are at issue in this case: whether Plaintiff has adduced evidence that he was subject to an adverse action—involuntary retirement,[12] and whether the circumstances give rise to an inference of gender discrimination.

"Plainly an employee's 'discharge,'. . . is an adverse employment action" under the federal discrimination statutes. *Green v. Town of E. Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (addressing ADEA claim). Thus, "[t]o satisfy the third element of the prima facie case, a discharge may consist of either the employer's actual termination of the plaintiff's employment or the existence of intolerable conditions, attributable to the employer, amounting to a 'constructive' discharge." *Id.*

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* However, "a constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely 'difficult or unpleasant.'" *Green*, 952 F.3d at 404. Rather, as the second prong indicates, the standard is objective:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

---

[12] The parties refer to Plaintiff's involuntary retirement claim as one for constructive discharge. (Dkt. No. 38-1, at 23; Dkt. No. 39-3, at 21). The Court does likewise.

*Id.* (quoting *Harris*, 510 U.S. at 21). Thus, courts generally find "that a plaintiff makes a prima facie showing of an adverse employment action if she adduces evidence from which a rational juror could infer that the employer made her working condition, viewed as a whole, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 404–05 (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir. 1998)).

Viewing the facts in the light most favorable to Plaintiff, a rational juror could find that as the infectious disease control nurse at a correctional facility during the onset of the COVID-19 pandemic, Plaintiff was responsible for coordinating with BOP's Regional Infectious Disease Control, educating staff, employing strategies to mitigate the spread of COVID-19, and keeping "abreast of rapidly changing protocol." (Dkt. No. 38-49, ¶ 3; Dkt. No. 39-1, ¶ 3 (quotation marks omitted); R-0179); that in May or June 2000, the Region sent Plaintiff a COVID-19 test machine and tasked him with training staff to use it but that the Warden had it placed in his conference room, leaving Plaintiff without a much-needed resource and unable to train staff how to use it; that despite other "nurses across the agency" receiving incentive awards, Warden Lovett and AW Straesser denied one for Plaintiff, (R-0659); that Human Resources and Warden Lovett's executive assistant interfered with Plaintiff's TB testing duties, leading to a nullified test; that Plaintiff was counseled for performing the requirements of his position, for obtaining guidance from BOP health authorities in the region and for providing that guidance to Ray Brook officials after the staff member's TB test came back positive; that Plaintiff's recommendations that intake staff be notified after inmates they processed tested positive for COVID-19 were rejected and that Plaintiff was later falsely blamed when the BOP's Covid Review Team flagged the incident; that Plaintiff was subject to lengthy counseling by his first-line supervisor and the ire of Warden Lovett after he obtained advice from Region health officials regarding quarantine, isolation, and

contract tracing after an inmate tested positive for COVID-19; that Plaintiff was subject to schedule changes that required him to sleep in the parking lot between shifts; that Plaintiff's recommendations for creating quarantine housing were rejected by AW Straesser; that AW Straesser directed him to not make reports to the county, despite being one of his job responsibilities; that Plaintiff was not including in meetings with the Warden, despite such meetings being one of his job requirements; that Gladden told Plaintiff that Warden Lovett was angry with him; and that Plaintiff was assigned increased patient care duties, which, combined with the additional shifts, lack of sleep, and hinderances in his efforts to mitigate the spread of COVID-19, endangered his health and exposed him to sickness.

Although there is no evidence that anyone in Plaintiff's chain of command, or Warden Lovett threatened to terminate his employment or directed him to resign or retire, the absence of such evidence is not necessarily determinative. The Second Circuit recently rejected the contention that a plaintiff cannot show a constructive discharge "unless the threat (a) was a categorical ultimatum that if she did not resign she would be fired, and (b) was delivered by an ultimate decisionmaker as to firing." *Green*, 952 F.3d at 406. Instead, a constructive discharge "could properly be found where an employer merely, albeit 'clearly[,] express *his desire* that [an] employee resign because such a statement' could cause a reasonable person to feel compelled to resign." *Id.* at 407 (emphasis in original) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188–89 (2d Cir. 1987)). However, there is no evidence from which a reasonable fact-finder could infer that any of Plaintiff's superiors at Ray Brook expressed a desire that Plaintiff retire or that Plaintiff would leave Ray Brook. At most, there is evidence that Warden Lovett was angry with Plaintiff for contacting BOP regional officials, informing them of COVID-19 or TB issues at Ray Brook, and seeking advice. *Cf.*, *e.g.*, *Schoenadel v. YouGov Am. Inc.*, No. 22-cv-10236,

2025 WL 371089, at *6, 2025 U.S. Dist. LEXIS 18997, at *16 (S.D.N.Y. Feb. 3, 2025) (finding evidence that the plaintiff "was singled out for criticism, denied compensation," that promised responsibilities were "stripped away, that leadership stopped talking to her or inviting her to meetings, and that she was told the CFO 'hated her guts' and wanted to get rid of her" could lead a reasonable juror to conclude that the plaintiff's "working conditions to be 'so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign'" (quoting *Green*, 952 F.3d at 405)).

There is authority for the proposition that a "work environment that puts an employee at 'unreasonable risk of physical harm' is sufficiently intolerable to support a claim of constructive discharge." *Cabrera v. CBS Corp.*, No. 17-cv-6011, 2018 WL 1225260, at *7, 2018 U.S. Dist. LEXIS 31814, at *18–19 (S.D.N.Y. Feb. 26, 2018) (quoting *Ternullo v. Reno*, 8 F. Supp. 2d 186, 191–92 (N.D.N.Y. 1998)); *see also Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) ("A constructive discharge may be found on the basis of evidence that an employer deliberately sought to place an employee in a position that jeopardized his or her health." (citing *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 371–72 (5th Cir. 1981))); *see also Gayles v. Roswell Park Cancer Inst. Corp.*, No. 22-cv-00750, 2023 WL 6304020, at *6, 2023 U.S. Dist. LEXIS 174496, at *18 (W.D.N.Y. Sept. 28, 2023) (finding the plaintiff stated plausible constructive discharge claim in the context of the COVID-19 pandemic where she alleged, among other things, that she was required to work in person, while others were allowed to work remotely, even though she or her son were at "at high-risk for COVID-19 complications."); *see also Knight v. MTA N.Y.C. Transit Auth.*, No. 19-cv-1428, 2021 WL 10424509, at *10, 2021 U.S. Dist. LEXIS 187672, at *29 (E.D.N.Y. Sept. 28, 2021) (same). In this case, however, there

is no evidence that Plaintiff was at high-risk for COVID-19 complications or other illness or in physical danger.

However, even assuming Plaintiff has satisfied the de minimis burden at the prima facie stage of showing an adverse employment action, as discussed above, Plaintiff presents no evidence from which a rational factfinder could conclude Plaintiff was subjected to the alleged hostility on the basis of gender. *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91–92 (2d Cir. 1996) (explaining prima facie case for constructive discharge under Title VII requires showing that the conduct occurred "under circumstances that give rise to an inference of discrimination"). Accordingly, Defendant's motion for summary judgment dismissing Plaintiff's Title VII constructive discharge claim is granted.

### 3.    Disparate Treatment

For the reasons discussed above, because there is no evidence from which a reasonable juror could find Plaintiff was subject to disparate treatment based on gender, Defendant is entitled to summary judgment dismissing Plaintiff's disparate treatment claim.

## B.    MSPB Decision

### 1.    Legal Standard

Under 5 U.S.C. § 7703(c), the Court must affirm the MSPB's decision as to any non-discrimination claim unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) [was] obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Parrott v. Merit Sys. Prot. Bd.*, 519 F.3d 1328, 1334 (Fed. Cir. 2008). "Under this standard, [the Court] review[s] determinations of the Board concerning its jurisdiction de novo" but "the [f]indings of fact underlying the Board's jurisdictional decision are reviewed for substantial evidence." *Id.* The review of the MSPB's determination of a nondiscrimination claim is made "solely upon the

administrative record." *Figueroa v. Nielsen*, 423 F. Supp. 3d 21, 28 (S.D.N.Y. 2019) (quoting *Fineman v. United States Postal Serv.*, 555 F. Supp. 1336, 1341 (S.D.N.Y. 1983)).

"Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones v. Merit Sys. Prot. Bd.*, No. 2024-2110, 2025 WL 1621530, at *5, 2025 U.S. App. LEXIS 14054, at *12 (Fed. Cir. June 9, 2025) (quoting *Consol. Edison of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Even when reasonable minds may disagree with a lower court's findings, an appellate court must accept the lower court's findings when the record provides support for the challenged findings." *Id.* (citing *In re Jolley*, 308 F.3d 1317, 1320 (Fed. Cir. 2002)).

### 2.    Involuntary Retirement (Non-Discrimination Claim)

The Government moves for summary judgment arguing that the MSPB correctly determined that it lacked jurisdiction to hear Plaintiffs' involuntary retirement claim. (Dkt. No. 38-1, at 28–30). Plaintiff argues that the AJ erred in dismissing his appeal for lack of jurisdiction and without a hearing because the evidence he presented "more than satisfies" the standard for making nonfrivolous allegations of involuntary retirement. (Dkt. No. 39-3, at 10–21).

The "governing background principles" of an involuntary retirement claim brought before the Board are well-settled: first, "[a] decision to . . . retire is presumed to be voluntary, and an employee who voluntarily retires has no right to appeal to the Board;" second, "the Board assumes jurisdiction over an appeal by an employee who has . . . retired only if the employee shows that his . . . retirement was involuntary and thus tantamount to forced removal." *Staats v. United States Postal Serv.*, 99 F.3d 1120, 1123–24 (Fed. Cir. 1996). An employee is only entitled to a hearing before the MSPB if he satisfies the jurisdictional threshold, which requires the employee to make a "non-frivolous showing" that his retirement was the "product of misinformation," deception, or coercion by the agency. *Conforto v. Merit Sys. Prot. Bd.*, 713

F.3d 1111, 1121 (Fed. Cir. 2013), *abrogated on other grounds by Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420 (2017). In this case, Plaintiff's asserts that Defendant coerced him into retirement by "creating working conditions so intolerable for the employee that he [was] driven to involuntarily resign or retire." *Shoaf v. Dep't of Agr.*, 260 F.3d 1336, 1341 (Fed. Cir. 2001).

To establish "involuntary coercion by an agency," and employee must show: "(1) the agency effectively imposed the terms of the employee's resignation or retirement; (2) the employee had no realistic alternative but to resign or retire; and (3) the employee's resignation or retirement was the result of improper acts by the agency." *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1329 (Fed. Cir. 2006) (quoting *Shoaf*, 260 F.3d at 1341). The test for "evaluating involuntariness . . . is an objective one and one that consider[s] the totality of the circumstances." *Id.* (internal quotation marks omitted). Thus, the employee must "establish that a reasonable employee confronted with the same circumstances would feel coerced into resigning." *Id.* (quoting *Middleton v. Dep't of Defense*, 185 F.3d 1374, 1379 (Fed. Cir. 1999)). Central to the application of "this objective test" is the concept of "freedom of choice." *Id.*

In her Initial Decision, the AJ recited Plaintiff's allegation of involuntary retirement: "Ultimately, [Plaintiff] retired because he was prevented from doing his job as an Infectious Disease Coordinator . . . [H]is safety and life, and the lives/safety of staff and inmates, were put into unnecessary risk due to deliberate understaffing and forcing [Plaintiff] to perform more patient care duties." (R-0763 (quoting R-0388)). The AJ noted that Plaintiff had testified: (1) to being "ordered 'not to make appropriate emails, memos, or phone calls to Regional resources, which is inherent in my job'"; (2) that Warden Lovett "took away" the COVID-19 test machine, which Plaintiff "needed to train his staff"; (3) "that a supervisor instructed him not to contact other departments, and he was forced to [sic] 80 percent of patient care because of

understaffing"; (4) that he "feared for his job, because it was known that the Warden was furious

with him"; and (5) that he had "been disciplined for doing his job, and had been given an illegal

order"; (6) that the Warden "set him up to fail by denying some of his proposals . . . or by

micromanaging him and restricting his communications." (R-0763–64; R-0767 (quotation marks

omitted)).

Plaintiff argues that his submissions to the AJ documented the conditions, which, when

"consider[ed] cumulativel[y]," made his work environment so hostile and intolerable "that no

reasonable person in his position could be expected to endure" them. (Dkt. No. 39-3, at 14).

Plaintiff further argues that the AJ erred "in disregarding substantial corroborating evidence from

witnesses, which substantiate [his] allegations of coercive working conditions." (*Id.*).

The AJ expressly considered "the totality of the circumstance" in evaluating the

conditions Plaintiff identified as intolerable but found even if proven, the allegations were

insufficient "to support a finding that a decision to resign or retire was involuntary." (R-0768).

The Court finds no legal or factual error in this finding. In the context of an alleged involuntary

retirement or removal, allegations of stressful work environments, even when combined with

increased demands, unfair criticism, and work assignments perceived by the employee as

designed to cause him to fail, "do not equate to coercion." *McKeown v. Merit Sys. Prot. Bd.*, 809

F. App'x 953, 956 (Fed. Cir. 2020) (citing *Brown v. United States Postal Serv.*, 115 M.S.P.R.

609, 616−17 (M.S.P.B. 2011) (reasoning that a finding of coercion was not supported by an

appellant's allegations of, among other things, her supervisors' "increasing demands that she

perceived as trying to cause her to fail" and "groundless[ ] critic[ism]" of her work), and *Miller

v. Dep't of Def.*, 85 M.S.P.R. 310, 322 (M.S.P.B. 2000) ("Dissatisfaction with work assignments,

a feeling of being unfairly criticized, or difficult or unpleasant working conditions are generally

not so intolerable as to compel a reasonable person to resign.")); *see also Trobovic v. Merit Sys. Prot. Bd.*, 232 F. App'x 958, 963–64 (Fed. Cir. 2007) (finding alleged facts, including unmanageable workload, denial of promotion, abusive language by coworker in front of colleagues, that supervisor accused the plaintiff "of criminal activity at the behest of disgruntled members of the charitable organization on whose board [the plaintiff] serves," and that the supervisor humiliated the plaintiff by "directing him to report to non-supervisory co-workers and/or contract employees" "did not rise to the level of working conditions so intolerable that a reasonable person confronted with the same circumstances would feel coerced into leaving the workplace") (internal quotation marks omitted).

Plaintiff argues that the AJ failed to address the evidence from NP Sorrell and a co-worker corroborating Plaintiff's claims that he "was barred from communicating with health authorities, confirming that management obstructed his role's requirements" and confirming that Plaintiff resigned due to hostile work conditions. (Dkt. No. 39-3, at 15 (citing R-0317–36; R-0200–08)). However, "[a]n Administrative Judge need not explicitly address all of a petitioner's allegations or evidence in her opinion: Omission does not indicate a lack of consideration." *McKeown*, 809 F. App'x at 956 (citing *Marques v. Dep't of Health & Human Servs.*, 22 M.S.P.R. 129, 132 (M.S.P.B. 1984)). Further, there is no indication that the AJ did not consider this evidence, which was part of the Administrative Record. Moreover, the AJ expressly found that even if Plaintiff "could prove these claims," including the "allegation that the Warden hated him and 'set him up to fail' by denying some of his proposals and the use of a testing machine, or by micromanaging him and restricting his communications," they were "not sufficiently abusive to convince a reasonable employee to retire." (R-0767). Thus, any failure to consider Plaintiff's "corroborating evidence" of those claims was harmless.

Plaintiff further argues that the AJ erred in finding that Plaintiff "had the option to remain employed while he pursued relief through his EEO complaint or elsewhere." (Dkt. No. 39-3, at 12–13 (quoting R-0767)). Plaintiff argues this was erroneous because (1) there is no injunctive relief available through the EEO and or through the Office of Special Counsel and notes that ultimately, both entities ultimately failed to provide relief, and (2) the AJ failed to identify what "other process" he could have obtained elsewhere. (*Id.*). The Court finds no error in the AJ's finding that Plaintiff failed to show that a reasonable employee "would have had no choice but to retire under these circumstances." *Marshall v. Merit Sys. Prot. Bd.*, No. 24-1330, 2024 WL 4533355, at *3, 2024 U.S. App. LEXIS 26486, at *7 (Fed. Cir. Oct. 21, 2024). To the extent Plaintiff believed he was subject to intolerable conduct based on sex, a claim he made in his MSPB appeal, he could have filed a complaint with the EEO while he was still employed. Likewise, to the extent Plaintiff believed he was being subject to reprisal for whistleblowing disclosures to the Region, he could have filed a claim with the Office of Special Counsel while he was still employed. Although Plaintiff views such remedies as useless given the outcomes of his later claims to both the EEO and OSC, he does not dispute that they were available options. *See Marshall*, 2024 WL 4533355, at *3, 2024 U.S. App. LEXIS 26486, at *7 (finding no error in MSPB's finding that the plaintiff "could have sought redress" for allegedly discriminatory actions "via proper channels, rather than retire," explaining that "[w]hile it may have been an unpleasant prospect to pursue a different remedy," the fact that the plaintiff's "'choice [was] limited to two unattractive options does not make the employee's decision any less voluntary'" (quoting *Garcia*, 437 F.3d at 1329)).

Finally, Plaintiff argues that he was "misled by personnel where [sic] he was told not to rescind his retirement." (Dkt. No. 39-3, at 20). However, Plaintiff does not appear to have made

this argument to the AJ as it does not appear in either of the briefs he submitted in support of jurisdiction and it was not addressed in the AJ's Initial Decision.[13] The Court therefore finds the argument waived and declines to review it in the first instance. *See McKeown*, 809 F. App'x at 956 (considering "argument waived" where the plaintiff asserted for the first time on judicial review that fear of personal liability for fraud compelled him to resign and had not made the argument to the AJ).

### 3.    Whistleblower Retaliation Claim

Defendant moves for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies as to his whistleblower reprisal claim under the WPA. Plaintiff opposes Defendant's motion and argues remand is required because the AJ failed to inform Plaintiff of his burden of proof as to his whistleblower retaliation affirmative defense and failed to consider the affirmative defense altogether. (Dkt. No. 39-3, at 4–6).

### a.    Administrative Exhaustion

The Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. § 1101 et seq., prescribes the administrative remedies federal employees must exhaust before they can obtain judicial review of "certain serious personnel actions." *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 422 (2017); *see Chinniah v. FERC*, 62 F.4th 700, 702 (2d Cir. 2023) ("Under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." (quoting *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433 (D.C. Cir. 1996)). The appropriate administrative pathway to judicial review depends on the nature of the claims.

---

[13] Plaintiff asserted in his first brief (filed pro se) that Beth Hill from Benefit Services stated "once the paperwork was submitted, it could not be reversed," but Plaintiff made this assertion in support of his contention that HSA Malcolm's arrival at Ray Brook, and purported assurances to Plaintiff that he would "help with Administration's actions toward me" "came too late to matter." (R-0082).

Where, as here, a federal employee alleges violations of a federal antidiscrimination law, including Title VII, and violations of the WPA in connection with a serious personnel action—involuntary retirement,[14] the employee may file a discrimination complaint with the agency's equal employment opportunity office. *Perry*, 582 U.S. at 424 (explaining one "procedural route[] for an employee's pursuit of a mixed case," involves the employee's filing of "a discrimination complaint with the agency itself, in the agency's equal employment opportunity (EEO) office") (internal quotation marks omitted) (citing 5 C.F.R. § 1201.154(a) (2012); 29 C.F.R. § 1614.302(b) (2012)); 5 U.S.C. § 7702(a)(2)).[15] If the EEO decides against the employee, the employee may appeal the involuntary retirement and discrimination claims directly to the MSPB. *Id.*[16]

A whistleblowing claim under the WPA has its own exhaustion requirements: "an aggrieved employee may select one remedy from the following choices: a direct appeal to the Board, a negotiated grievance procedure, or seeking corrective action from the OSC." *Holderfield v. Merit Sys. Prot. Bd.*, 326 F.3d 1207, 1210 (Fed. Cir. 2003) (citing 5 U.S.C. § 7121(g)); *see also* 5 U.S.C. § 1214(a)(3).

### b.    Plaintiff's Administrative Filings

In this case, Plaintiff filed a "Whistleblower Complaint" with OSC's Disclosure Unit on or about December 11, 2020. (R-0006; R-0024; *see also* R-0090–99). In a letter dated January

---

[14] A federal employee complaining of a serious personnel action and alleging "that the action was based on" a violation of federal antidiscrimination laws, "is said (by pertinent regulation) to have brought a 'mixed case.'" *Perry*, 582 U.S. at 424 (quoting *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012)); *see also* 29 C.F.R. § 1614.302 (defining a "mixed case complaint" as "a complaint of employment discrimination filed with a federal agency . . . . related to or stemming from" a serious personnel action).

[15] "Alternatively, the employee may initiate the process by bringing her case directly to the MSPB, forgoing the agency's own system for evaluating discrimination charges." *Perry*, 582 U.S. at 424–45 (quoting *Kloeckner*, 568 U.S. at 45); *see also* 5 U.S.C. § 7702(a)(1).

[16] The employee also has the option of "bypass[ing] further administrative review by suing the agency in district court." *Id.* at 424 (quoting *Kloeckner*, 568 U.S. at 45)).

21, 2021, an OSC attorney informed Plaintiff the "Disclosure Unit" had "completed its review of the information [Plaintiff] referred" but that it could not "conclude that there is a substantial likelihood that BOP officers acted outside their discretion" and that it was closing the file. (R-0024–25).

On February 2, 2021, Plaintiff filed a complaint with the EEO alleging discrimination based on sex (male) and reprisal (retaliation). (Dkt. No. 38-29, at 2). The EEO complaint did not expressly allege whistleblowing, but it appears Plaintiff raised whistleblowing arguments during the EEO proceedings because they were noted in the Final Agency Decision:

> The bulk of complainant's allegations or retaliation involved claims that FCI officials retaliated against him for adhering to BOP health protocols and, in doing so, highlighting their mishandling of the COVID-19 pandemic. While such alleged retaliation, if true, would be very concerning, it does not state a claim under federal employment discrimination statutes, such as Title VII. Retaliation for 'whistleblowing,' unrelated to any EEO activity, does not violate Title VII.

(R0020–21).[17] In any event, the Final Agency Decision concluded that there was no basis to find disparate treatment, hostile work environment, or constructive discharge on the basis of sex. (R-0023).

Plaintiff next filed a mixed case appeal with the MSPB challenging his involuntary retirement and sex discrimination.[18] (R-0003–08). Although Plaintiff did not explicitly assert

---

[17] The regulation governing the filing of a mixed case (serious personnel action and discrimination) complaint with the EEO states that such a "complaint may contain only an allegation of employment discrimination or it may contain additional allegations that the MSPB has jurisdiction to address." 29 C.F.R. § 1614.302(a)(1). But even if a whistleblowing claim is a permissible "additional allegation[]," such claims are outside the EEO's purview, *see Kerr v. Jewell*, 836 F.3d 1048, 1052 (9th Cir. 2016) (finding the civil rights office's dismissal of whistleblowing retaliation claims was consistent "with longstanding Equal Opportunity Employment Commission . . . precedent declining jurisdiction over claims of retaliation not based on discrimination").

[18] When asked to explain why Plaintiff believed the "agency was wrong in taking this action," Plaintiff responded:

> Complainant said that FCI officials ordered him not to follow health protocols, on October 23, 2020, he was forced to resign due to intolerable working conditions. [(2)] Additionally, [he] allege[d] that management subjected [him] to adverse employment actions for performing duties required by [his] medical profession.

whistleblower retaliation on the MSPB appeal form, he did reference his previous filing with the OSC. (R-0006). Question 9 on the MSPB appeal form asks: "Did you file a whistleblowing complaint with the [OSC]?" Plaintiff checked "Yes" and stated that he filed the complaint with OSC on December 11, 2020. (*Id.*). Question 10 asks "Have you received written notice that the [OSC] made a decision or terminated its investigation?" (*Id.*). Plaintiff checked "Yes" and stated that the date of that decision was January 12, 2021. (*Id.*). Plaintiff attached the OSC's decision to his MSPB appeal form. (R-0024–25).

The MSPB only has jurisdiction over "certain serious personnel actions against federal employees." *Perry*, 582 U.S. at 422; *see* 5 U.S.C. § 1204 (describing powers and functions of MSPB). One of these actions is removal, *see* 5 U.S.C. § 7512(1)–(5) (listing covered actions), which includes involuntary retirement and constructive discharge claims so long as the employee makes "a non-frivolous allegation" that his retirement or resignation was involuntary, *Garcia*, 437 F.3d at 1328; *see also Shoaf*, 260 F.3d at 1340–41 ("A decision to resign or retire is presumed to be voluntary" and "[a]n employee who voluntarily resigns or retires has no right to appeal to the MSPB."). Accordingly, shortly after Plaintiff filed his appeal, the AJ issued an "Order on Jurisdiction and Proof Requirements" notifying Plaintiff that because "retirements are presumed to be voluntary," and voluntary actions are not appealable to the Board, his appeal would be dismissed for lack of jurisdiction unless he made "a nonfrivolous allegation that [he] . . . retired because of duress, coercion, or misrepresentation by the agency." (R-0049–50). The AJ also explained that the Board would "only address" Plaintiff's discrimination claim "insofar as it

---

[(3)] Lastly, [he] allege[d] that the Warden jeopardized community public health regarding the COVID-19 pandemic by refusing to follow federal and BOP guidelines in responding to the pandemic. Obtained [report of investigation] proves plaintiff claims other than Sex Discrimination.

(R-0007) (all alterations except last in original) (quotation marks omitted).

is relevant to the issue of voluntariness" and would not consider the merits unless Plaintiff
proved the Board had jurisdiction over his retirement. (R-0051). The AJ did not mention
whistleblowing claims in this order.

Following the parties' briefing, the AJ issued an "Initial Decision" explaining that an
"appellant is entitled to a hearing on the issue of Board jurisdiction over an alleged involuntary
. . . retirement claim only if she makes a nonfrivolous allegation casting doubt on the
presumption of voluntariness" and that the Board would not address "issues of discrimination"
until "the Board's jurisdiction has been established." (R-0766). Finding that Plaintiff "failed to
nonfrivolously allege that his retirement was involuntary," the AJ dismissed Plaintiff's appeal for
"lack of jurisdiction [and] without the requested hearing." (R-0762, R-0767). Whistleblowing is
not mentioned in the decision.

After the Initial Decision became final, (*see* R-0769), Plaintiff filed the instant Complaint
asserting, inter alia, a "retaliation for whistleblower activity" claim, (Dkt. No. 1, at 15 (Count
IV)). Plaintiff alleged that he disclosed violations concerning "a substantial and specific danger
to public health and safety," and that his "disclosures were a motiving factor in Defendant's
adverse actions," in violation of the Whistleblower Protection Enhancement Act, 5 U.S.C. §
2302(b)(8) and (9).

c.    **Analysis**

As Plaintiff acknowledges, although Plaintiff sent a letter regarding "whistleblowing
activity" to OSC's "disclosure unit," he did not seek corrective action before the OSC. (Dkt. No.
39-3, at 6 (Plaintiff explaining that his "OSC complaint referenced whistleblower activity but did
not constitute an . . . election where it did not involve Plaintiff's involuntary retirement, nor was
this the OSC's investigation/retaliation unit, but rather its disclosure unit")). Nor is there any
evidence or suggestion that Plaintiff filed a grievance pursuant to the negotiated grievance

procedure. Indeed, in this case, Plaintiff contends he included whistleblowing as an affirmative

defense in connection with his involuntary retirement appeal to the MSPB, which, in some

instances, is a permissible path for exhaustion. *Holderfield*, 326 F.3d at 1210; *see also Roach v.*

*Dep't of Army*, 82 M.S.P.R. 464, 469 (M.S.P.B. 1999) ("Where . . . an agency takes an action

against an employee that is otherwise appealable to the Board, an employee who believes the

action was in retaliation for whistleblowing may choose either to seek corrective action from to

OSC. . . or to appeal directly to the Board."); *Baca v. Dep't of the Army*, 983 F.3d 1131, 1137

(10th Cir. 2020) (explaining that whistleblower reprisal may be raised "as an affirmative defense

to an adverse employment action over which the MSPB has jurisdiction under 5 U.S.C. § 7513").

The Government disputes this, arguing that (1) "Plaintiff abandoned his whistleblower claim

before the MSPB," and (2) even if it was properly raised, remand would be futile in light of the

AJ's finding that the Board lacked jurisdiction because Plaintiff failed to make a nonfrivolous

allegation that his retirement was involuntary.[19] (Dkt. No. 38-1, at 25, 27). Plaintiff responds that

remand of his whistleblower retaliation claim is required because the AJ erred procedurally in

failing to advise him of his burden with respect to a whistleblower affirmative defense and in

failing to address it in the Initial Decision. (Dkt. No. 39-3, at 6–7). Thus, the Court must

consider: (1) whether Plaintiff asserted a whistleblowing affirmative defense in his MSPB

appeal; (2) whether the AJ provided the requisite notice and instructions on burden; and (3)

whether remand is required.

   "Any defense a party 'fail[s] to affirmatively plead' before the MSPB is 'waived.'"

*Wallace v. Wormuth*, No. 18-cv-6525, 2022 WL 993064, at *22, 2022 U.S. Dist. LEXIS 61329,

---

[19] The Government also argues that remand would be futile because Plaintiff's whistleblowing allegations "are insufficient as a matter of law." (Dkt. No. 38-1, at 27). However, as it appears Plaintiff's allegations are unexhausted, the Court concludes that judicial review would be improper at this juncture.

at *72 (S.D.N.Y. Mar. 31, 2022) (quoting *Stearn v. Dep't of the Navy*, 280 F.3d 1376, 1381 (Fed.

Cir. 2002)). "[A] defense is timely raised at any point before the end of the conference held to

define the issues in the case." *Id.* 2022 WL 993064, at *22, 2022 U.S. Dist. LEXIS 61329, at *72

(quoting *Stearn*, 280 F.3d at 1380); *see also* 5 C.F.R. § 1201.24(b).

The administrative record shows that Plaintiff's appeal alleged involuntary retirement and

referenced "sex discrimination" but did not expressly assert whistleblowing retaliation as an

affirmative defense. *Cf.*, *e.g.*, *Wallace*, 2022 WL 993064, at *21, 2022 U.S. Dist. LEXIS 61329,

at *70 (noting that the plaintiff "mentioned, by statutory citation, a WPA affirmative defense in

her initial appeal"). However, Plaintiff responded "Yes" to the questions on the appeal form

asking: "Did you file a whistleblowing complaint with the Office of Special Counsel (OSC)?"

and "Have you received written notice that the Office of Special Counsel made a decision or

terminated its investigation?" (R-0005). Further, Plaintiff attached his OSC complaint and the

OSC's decision to the appeal. (R-0005, R-0008). There are two additional references to

whistleblowing in the administrative record. In a "Supplemental Response to Jurisdiction Order,"

Plaintiff included a footnote stating that "discrimination based on his sex contributed to his

intolerable working conditions" and that he was also alleging "whistleblower retaliation as

contributing to intolerable working conditions." (R-0398 n.7 (citing "OSC Closure Letter")).

And, in its "Response to Jurisdiction Order" submission, the Agency included the following

footnote on whistleblowing:

> Appellant's instant appeal does not appear to be alleging an appeal
> of the whistleblower complaint, and only appeals his EEO complaint
> issues and final agency decision. To the extent it is, the Agency
> states the record is insufficient to show when the whistleblower
> complaint was filed, but based on the January 2021 date of the
> decision, it would seem Appellant did not file the complaint until
> after his retirement with the Agency, and thus, retaliation for the
> whistleblower complaint could not have contributed to his alleged

> forced retirement. Should this be an argument of Appellant's, the
> Agency would request an opportunity to supplement its response if
> Appellant provides clarifying information and non-frivolous
> allegations regarding as much.

(R-0741 n.3) (internal citation omitted). The AJ referred to discrimination and Plaintiff's burden

with respect to showing involuntary retirement in the "Jurisdiction Order," but made no mention

of whistleblowing retaliation. Not is whistleblowing retaliation mentioned in the AJ's Initial

Decision.

In general, "[t]he MSPB has appeared to interpret" 5 C.F.R. § 1201.24(b), the regulation

governing MSPB appeals, "as stating that an appellant abandons a claim or defense only after

[]he fails to object to the MSPB's summary of a prehearing conference that does not include a

particular claim or defense." *Wallace*, 2022 WL 993064, at *22, 2022 U.S. Dist. LEXIS 61329,

at *72–73 (citing *Buie v. Off. of Pers. Mgmt.*, 94 M.S.P.R. 595, 603 (M.S.P.B. Sept. 30, 2003),

*aff'd*, 386 F.3d 1127 (Fed. Cir. 2004)). Here, however, the appeal never progressed to a

prehearing conference as it was dismissed prior to a hearing after the AJ found that Plaintiff

failed to allege a nonfrivolous allegation of involuntary retirement. (*See* R-0762 (dismissing

appeal "for lack of jurisdiction without the requested hearing)). In any event, the Court finds no

basis for concluding that Plaintiff waived whistleblowing as an affirmative defense because

Plaintiff referred to his OSC whistleblowing complaint in his appeal, attached it to his appeal,

and signified intent to raise whistleblowing retaliation in his response to the AJ's Jurisdiction.

"[W]hen an appellant raises an affirmative defense in an appeal either by . . . identifying

an affirmative defense by name . . . or by alleging facts that reasonably raise such an affirmative

defense, the administrative judge must address the affirmative defense(s) in any close of record

order or prehearing conference summary and order." *Wallace*, 2022 WL 993064, at *22, 2022

U.S. Dist. LEXIS 61329, at *72–73 (quoting *Wynn v. U.S. Postal Serv.*, 115 M.S.P.R. 146, 149-

50 (M.S.P.B. Nov. 2, 2010)). In addition, "the Board has consistently required AJs to apprise an appellant of the applicable burdens of going forward with the evidence and of proving a particular affirmative defense, as well as the kind of evidence the appellant is required to produce to meet his burden." *Erkins v. United States Postal Serv.*, 108 M.S.P.R. 367, 370 (M.S.P.B. 2008).

In the Jurisdiction Order, the AJ (1) apprised Plaintiff of the allegations required to show a nonfrivolous claim of involuntary retirement, and (2) explained that Plaintiff's discrimination claims (also affirmative defenses in this context) would not be considered unless the Board determined it had jurisdiction, and then would be considered "under the standards of the applicable antidiscrimination statute," (R-0051), but did not refer to whistleblower retaliation. Defendant argues that remand to the AJ for the purpose of apprising Plaintiff of his burden of proof on this issue would be futile in light of the AJ's conclusion that the Board lacked jurisdiction. (Dkt. No. 38-1, at 27). The Court agrees that any error was harmless.

Plaintiff has identified no prejudice from the AJ's failure to apprise him of the burden he must sustain, or the evidence required, to prove a whistleblower affirmative defense. It is undisputed that in the Jurisdiction Order, the AJ outlined the "detailed factual allegations" Plaintiff was required to make in order to make a "nonfrivolous allegation" of involuntary retirement sufficient to invoke the Board's jurisdiction. (R-0050–51). The AJ further advised Plaintiff that his discrimination claim (affirmative defense) would only be considered "insofar as it is relevant to the issue of involuntariness" and would not be considered on the merits until after jurisdiction was established. (R-0051). In his responses to the Jurisdiction Order, Plaintiff discussed his allegations of retaliation and reprisal for performing his reporting requirements and "performing his job," "in a material way" significantly jeopardizing "staff, inmate, and public

safety," (R-0067), and expressly noted that he was also pursuing his whistleblowing and discrimination claims as part of his appeal, (R-0398 n.7). Plaintiff identifies no additional evidence or arguments that he would have relied on to establish the Board's jurisdiction had the AJ included whistleblowing in the Jurisdiction Order. *Cf.*, *Kuriakose v. Dep't of Veterans Affs.*, 800 F. App'x 889, 895 (Fed. Cir. 2020) (finding no reversible error where the plaintiff failed to show "prejudice from the absence of written confirmation of the burdens of proof or the elements necessary to prove her claim," noting that the plaintiff herself "laid out the burdens and her proffered evidence in an earlier response to the Board's initial jurisdictional order" (citing *Wynn*, 115 M.S.P.R. at 150–51)). Nor does he make any suggestion that the issue of the Board's jurisdiction would have been decided differently, had the AJ apprised him in the Jurisdiction Order, of the burdens and evidence required to establish a whistleblowing affirmative defense. *See Miller v. Merit Sys. Prot. Bd.*, 208 F. App'x 902, 905–06 (Fed. Cir. 2006) (finding where the plaintiff received notice of her burden to establish jurisdiction, but no notice of her "burden to come forward with evidence," any error was harmless because the plaintiff did not "present a claim that invokes the Board['s] jurisdiction"). Thus, the Court find no prejudice from the AJ's failure to include a discussion of whistleblowing in the Jurisdiction Order, not least because Plaintiff failed to raise a nonfrivolous allegation of involuntary retirement, and the Board thus had no jurisdiction to consider whistleblower retaliation. *See Trinkl v. Dep't of Com.*, No. DC-0752-16-0387-I-1, 2016 WL 6212298, at *5 n.4 (M.S.P.B. Oct. 19, 2016) ("To the extent that the appellant is attempting to raise affirmative defenses of harmful error or whistleblower reprisal . . . absent an otherwise appealable action, the Board lacks jurisdiction to adjudicate such claims."); *see also Garcia*, 437 F.3d at 1335 ("If at any point during the case the Board

determines that the claimant has not carried this burden, then jurisdiction never attaches to the adverse action case and the Board never has the power to decide the discrimination issue.").

In other words, had Plaintiff alleged a serious personnel action, entitling him to a "direct appeal" to the MSPB, the MSPB would have had jurisdiction to consider his involuntary retirement claim and whistleblower allegations. But because Plaintiff did not have a right to a "direct appeal" to the MSPB, and because Plaintiff did not seek corrective action with OSC prior to filing his claim with the MSPB, *see* 5 U.S.C. § 1214(a)(3) ("Except in a case in which an employee . . . has the right to appeal directly to the [MSPB] under any law, rule, or regulation, any such employee. . . shall seek corrective action from the Special Counsel before seeking corrective action from the Board."), there was no basis on which the MSPB could take jurisdiction over these claims, *see Lawson v. Dep't of Health & Hum. Servs.*, 73 F.3d 377 (Fed. Cir. 1995) (finding the MSPB did not err in determining it did not have jurisdiction over the plaintiff's whistleblower claim where the plaintiff failed to show he suffered "constructive removal" or other action over which MSPB had jurisdiction and concluding that because the plaintiff otherwise "failed to seek corrective action with the Office of Special Counsel before he filed his complaint with the Board, he failed to exhaust his remedies"); *see also Shanny v. Dep't of Veterans Affs.*, No. SF-0752-22-0377-I-1, 2022 WL 4011923 (M.S.P.B. Sept. 2, 2022) (Initial Decision) ("Since the appellant has not alleged a basis for jurisdiction over her resignation as an adverse action [constructive discharge] . . . the Board can only maintain jurisdiction over the appellants whistleblower retaliation claim if she has alleged an individual rights appeal (IRA), which required demonstration "of exhaustion of her administrative remedy with the Office of Special Counsel.").

Thus, the Court finds Plaintiff has failed to exhaust his administrative remedies with respect to his whistleblower retaliation claim and there is no basis for remand. Accordingly, the Court affirms the MSPB's dismissal for lack of jurisdiction and grants Defendant's motion for summary judgment.

## VI.    CONCLUSION

For the reasons set forth above, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. No. 38) is **GRANTED**; and it is further

**ORDERED** that the Complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: September 5, 2025

Brenda K. Sannes
Chief U.S. District Judge